Filed 6/16/14  P. v. Broxton CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C069245 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F02291) |
| v. | |
| JOHN BROXTON, | |
| Defendant and Appellant. | |

Defendant John Broxton was convicted of three counts of second degree robbery and sentenced to a state prison term of 17 years 8 months.  In this appeal, he contends (1) the trial court erred when it denied his *Batson/Wheeler*[1] motion on the ground he failed to establish a prima facie inference of discriminatory purpose; (2) insufficient evidence

---

[1]     *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

supports one of his robbery convictions; and (3) a live lineup identification process violated his due process rights. We disagree and affirm the judgment.

FACTS

*Robbery of Richard Conner*

As Richard Conner pulled into a Jimboy's Tacos parking lot to drop off two women passengers, three young Black men approached his car. They were dressed in dark clothing. Conner noticed another man in a white sweatshirt standing about 20 or 30 feet away. The men opened his passenger side car doors, ordered the women to leave, and robbed Conner. One of the men showed Conner that he had a gun and said that "he hadn't used [the gun] yet, [but] he'd like to try it out." Conner was told he would be shot if he looked at anybody. One of them also told Conner he would be shot if he did not give them the correct PIN for his ATM card. Conner did not recall seeing the man in the white sweatshirt after his ATM card was taken.

Conner called his bank upon arriving home and learned his ATM card had been used at a credit union within a mile of Jimboy's. Surveillance photos taken at the credit union showed a man in a white or light sweatshirt similar to the one Conner saw the man wearing who stood nearby during the robbery. The parties stipulated defendant was the person in the photos that used Conner's ATM card.

*Robbery of Zachary Basten and Andrew Santellan*

About one month after the Conner robbery, Zachary Basten and Andrew Santellan drove through the same Jimboy's drive-through. A man sitting on the curb asked Basten to use his phone. Basten declined, but he agreed to help jumpstart the man's car. The man, later identified as codefendant Mark Newsome, got into the back of Basten's truck and directed them to a nearby apartment complex. When they arrived, Newsome whistled, and three or four people ran towards them. They were all Black males wearing dark, hooded clothing, and they had handguns. Defendant was one of them. One of the men tapped on the passenger window with a gun. He opened the door, reached into

2

Santellan's pocket, and took his cell phone. He told Santellan to sit on a nearby fire hydrant.

Newsome pointed a gun at Basten and robbed him. Newsome threatened to kill Basten if he gave him an incorrect PIN for his ATM card. After Basten gave him the PIN, Newsome gave the ATM card to defendant, who immediately left with another man. About 20 minutes later, defendant and the other man returned and asked why they could get only $200 out of Basten's account. Defendant's handgun dangled at his side and moved with his hand as he talked.

Basten called his bank the next day, and he learned his ATM had been used at a Powermart 30 yards from the Jimboy's. Pictures taken from the store's surveillance video showed a man who "very closely depicted" defendant.

Three weeks later, Basten identified defendant in a live lineup. He also identified him at trial.

DISCUSSION

I

*Denial of* Batson/Wheeler *Motion*

Defendant, who is Black, raised a *Batson/Wheeler* objection after the prosecutor used his peremptory challenges to excuse two Black jurors from the venire. Defense counsel argued the excused jurors had not shown a predisposition to be pro-defense jurors and, in his opinion, appeared to be pro-prosecution. The trial court found defendant had not made a prima facie case of discrimination because two other Black jurors remained in the venire. After making this finding, the court said it felt the two excused jurors were fair jurors who had offered no responses in its view to support exclusion, and that one of the jurors may have been pro-prosecution.

The court gave the prosecutor a chance to place his reasons on the record. The prosecutor stated he was concerned with family involvement in the criminal justice system. The concern arose the day before with a White juror, but it was something he

3

considered with all prospective jurors. Both excused jurors had relatives who had previously been convicted of serious crimes; one, a nephew convicted of second degree murder, the other, a brother convicted of attempted murder. The prosecutor believed no remaining jurors had family members who had been through the trial or penal systems. The court did not change its ruling.

Defendant claims the court erred. He contends he established a prima facie case of an inference of racial bias. He also claims California law, which allows the appellate court to review the entire record for evidence to support the trial court's denial of a *Batson/Wheeler* motion, is contrary to federal authority that allegedly limits the court to reviewing only the prosecutor's reasons for excusing the jurors. We disagree with both of his contentions.

"The applicable law is settled. 'Under *Wheeler,* " '[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias -- that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds" -- violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.]' " [Citation.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]

" 'In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*[Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129] (*Johnson*)], fn.

4

omitted.)' (*People v. Streeter* (2012) 54 Cal.4th 205, 221 [].) The United States Supreme Court did not intend a movant's burden at the first, prima facie, stage 'to be so onerous that a defendant would have to persuade the judge -- on the basis of all the facts, some of which are impossible for the defendant to know with certainty -- that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' (*Johnson, supra*, 545 U.S. at p. 170.)" (*People v. Harris* (2013) 57 Cal.4th 804, 833 (*Harris*).)

"Although a prima facie showing may be made from any evidence in the record, we have noted 'certain types of evidence that will be relevant for this purpose. Thus the party may show that [opposing counsel] has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of . . . peremptories against the group. [The moving party] may also demonstrate that the jurors in question share only this one characteristic -- their membership in the group -- and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of [opposing counsel] to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if [the defendant] is, and especially if in addition [the] alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.' (*Wheeler, supra*, 22 Cal.3d at pp. 280-281, fn. omitted.)" (*Harris, supra*, 57 Cal.4th at pp. 834-835.)

We review the record independently to determine if defendant's evidence raised an inference the prosecutor excused the jurors on account of race. (*Harris, supra,* 57 Cal.4th at p. 834.)

5

Defendant's evidence did not raise an inference of group bias. The release of two Black jurors, with nothing more, while two more Black jurors remain in the venire, is insufficient evidence to support an inference of discriminatory intent. Defendant did not contend the prosecutor, for example, had used a disproportionate number of peremptories against Blacks, or had failed to engage the excused jurors in meaningful voir dire. He also could not show the excused jurors were, except for their race, as heterogeneous as the venire. They had family members who had been convicted of very serious crimes. This was a race-neutral reason for excusing the jurors. It is true that " ' "the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion." ' [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 343, original italics, fn. omitted.) So it is here.

Defendant criticizes the practice under California law of reviewing the entire record to find substantial evidence that supports the trial court's ruling, claiming it violates federal law. Our Supreme Court, however, requires a reviewing court to limit its review to the genuineness of the prosecutor's reasons when it is reviewing the second and third steps of the *Batson/Wheeler* analysis, after the defendant has established a prima facie case of discriminatory intent. (*People v. Jones* (2013) 57 Cal.4th 899, 917.) The first step is a question of law, which justifies our review of the entire record to find support for the trial court's determination as to whether a prima facie case exists. (*People v. Taylor* (2010) 48 Cal.4th 574, 614.) We are bound to comply with the high court's rulings. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

The trial court did not err in denying defendant's *Batson/Wheeler* motion.

II

*Sufficiency of Evidence Supporting Conviction of Robbing Conner*

Defendant contends there is insufficient evidence to convict him of aiding and abetting the robbery of Conner. Conner did not see him facilitate the robbery, and there

is no evidence defendant arrived with the other perpetrators or met up with them again after he used Conner's ATM card. We disagree with his contention.

"Whether a person has aided and abetted in the commission of a crime is a question of fact, and on appeal all conflicts in the evidence and attendant reasonable inferences are resolved in favor of the judgment. Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5, fns. omitted.)

There is sufficient evidence supporting defendant's conviction. Defendant was waiting in the same parking lot as the other men, and was only 20 or 30 feet away from where they robbed Conner. Conner was told he would be shot if he looked at anyone, suggesting defendant was standing back so as to avoid identification. Defendant was present in the lot only until Conner's ATM card was taken. Minutes later, a surveillance camera photographed defendant using that same card at a nearby credit union. This evidence indicates defendant was not a bystander to the robbery, but in fact participated in its commission. The evidence sufficiently supports defendant's conviction of robbing Conner.

### III

#### *Validity of the Live Lineup*

Defendant contends the process by which Basten identified him at the live lineup was unduly suggestive. Defendant did not object to Basten's identification of him at the lineup or at trial until he made an oral motion for new trial. Raising an error for the first time in a motion for new trial is insufficient to preserve the issue for appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 794.) Having thus forfeited the issue, defendant contends he suffered ineffective assistance of counsel due to his attorney's failure to object. We conclude he did not, because any objection would have been futile. Counsel's failure to

7

make a futile or unmeritorious objection is not ineffective assistance. (*People v. Anderson* (2001) 25 Cal.4th 543, 587.)

The facts of the identification are these: About three weeks after his robbery, Basten viewed a live lineup. He did not recall being shown a picture of defendant before the lineup, but the officiating detective claimed he showed Basten a picture of defendant from the Powermart surveillance video before the lineup. Also, during the lineup, defendant, who is five feet seven inches tall, was asked to stand on a box so that the suspects' heads were all at the same level. Basten did not know defendant was standing on a box. None of the suspects' feet were visible to Basten.

Basten viewed the lineup, and he identified defendant as the person who took his ATM card and obtained the money with it. At trial, Basten stated he had estimated defendant was roughly six feet tall. After defendant stood up, Basten estimated his height was between five feet eight inches and five feet ten inches. Basten did not doubt his identifications made during the lineup and in the courtroom of defendant as the perpetrator.

Defendant contends counsel should have objected to the lineup identification because the lineup was unduly suggestive and unreliable under the totality of the circumstances. He claims it was unduly suggestive because the detective showed Basten defendant's photo from the surveillance video before the lineup, and because defendant was placed on a box to raise his height to match the other persons in the lineup. He contends it was unreliable because Basten, at the time of the robbery, had little time to see defendant, it was dark, and there were three to four Black males obscuring their faces with hoods.

We disagree. An objection to the identification would not reasonably have been sustained. "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether

8

the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]" *(People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

The lineup was neither unduly suggestive nor unreliable, and thus an objection would not have been well taken. Permitting a witness to view a surveillance photograph of the crime prior to the lineup does not necessarily render the lineup unduly suggestive. (See *People v. Johnson* (2010) 183 Cal.App.4th 253, 273 [prior showing of robbery surveillance video did not taint photo lineup].) The actual photo shown to Basten is not included in the record, so we are unable to determine whether it may have been unduly suggestive. Also, eliminating individual factors in the lineup such as height to prevent a suspect from standing out from the others does not render the lineup unduly suggestive (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1223-1224), particularly where, as here, the box on which defendant stood was not visible.

Even if the lineup was unduly suggestive, Batson's identification of defendant was not unreliable. Basten had sufficient opportunity to observe defendant. During the robbery, defendant had stood five to 10 yards away, and Basten was able to see his face and identify him as one of the men who left the lot with his ATM card and later returned. Basten paid attention to defendant's actions, he was certain about his identification when he viewed the lineup, and only a short period of time elapsed from the crime to the lineup.

Because an objection by counsel to the identification under these circumstances would not reasonably have been sustained, defendant did not suffer ineffective assistance of counsel.

DISPOSITION

The judgment is affirmed.



      NICHOLSON      , Acting P. J.



We concur:



      ROBIE      , J.



      BUTZ      , J.